GLENNAN v. ROCHESTER TRUST & SAFE DEPOSIT CO.

(Supreme Court, Appellate Division, Fourth Department.   July 9, 1912.)

1. BANKS AND BANKING (§ 139*)—PAYMENT OF CHECKS—EFFECT OF PAYMENT.

Where a check presented to a bank for payment was paid by it in ordinary course, in good faith and without knowledge that the drawer had died before presentation, or facts sufficient to make a reasonable man inquire, it was thereby relieved from the necessity of paying the amount of the check to the representative of the deceased, as it could properly rely on the presumption that the check was given for value, as imported by the instrument itself.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 408; Dec. Dig. § 139.*]

2. ASSIGNMENTS (§ 59*)—DEPOSIT IN BANK—DEATH OF ASSIGNOR.

Where a person competent to execute an assignment of a fund in a bank assigned it under his signature, his death would not affect the validity of the assignment, and his administrator could not claim that the bank in which the funds assigned were deposited had improperly paid a check which accompanied the assignment.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 160; Dec. Dig. § 59.*]

3. WITNESSES (§ 140*)—COMPETENCY—INTEREST IN PROCEEDINGS.

In an action by an administrator against a bank, claimed to have wrongfully paid a check drawn by his intestate, the payee and his half-brother, who were beneficiaries thereunder, though interested in the questions involved, were neither parties to the action nor interested in its event, nor persons through whom the defendant derived its interest, so as to preclude their testifying therein under Code Civ. Proc. § 829, which bars the testimony of such witnesses.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 598–618; Dec. Dig. § 140.*]

Appeal from Trial Term, Monroe County.

Action by John W. Glennan, as administrator, etc., of John Callahan, against the Rochester Trust & Safe Deposit Company to recover a deposit made by his intestate. From a judgment for defendant and an order denying a motion for new trial, plaintiff appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

Harlan W. Rippey, of Rochester, for appellant.
William N. Cogswell, of Rochester, for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

McLENNAN, P. J. John Callahan for about 25 years prior to his death, which occurred on the 9th day of March, 1908, resided in the city of Washington, District of Columbia. On the 5th day of July, 1907, he deposited with the defendant the sum of $2,500, and received a passbook. The money was to draw interest at the rate of 4 per cent. on monthly balances while it remained on deposit with the defendant. Michael Naylon and Martin Naylon were half-brothers of Callahan, and resided in the city of Rochester. The Naylons were practically strangers to Callahan, as Michael Naylon had seen him not over three times in 40 years, and Martin Naylon, so far as the evidence shows, had seen him but once during that time. On February 10, 1908, Callahan entered a hospital in Washington, suffering from a disease from which he died at such hospital on March 9, 1908. On February 23, 1908, Edmund J. De Lacy, a son of Callahan's wife by a former marriage, wrote to the Naylons against the wishes of Callahan to come to Washington. On February 29, 1908, Michael Naylon went to the defendant's bank, and told one of its officers or employés that Callahan was sick, and that he, Naylon, wanted a check to take down to Callahan for his signature, so that he could procure the money on deposit in defendant's bank in case Callahan died, and at that time got the information from defendant that the interest accrued on the deposit amounted to $33.33. On the following morning, March 1st, which was Sunday, the two Naylons arrived at Washington, and saw Callahan at the hospital twice on that day. The next morning, Monday, between 8 and 9 o'clock, the Naylons procured a notary, who was a stranger to them and Callahan, and went to the hospital. There they received a check on the defendant bank dated March 2, 1908, to the order of Michael Naylon for $2,533.33, signed by John Callahan, and also an assignment which, for a consideration of $5 and other consideration not named, assumed to transfer and to convey to Michael Naylon the sum of $2,533.33 on deposit to the credit of John Callahan in defendant's bank, with full power and authority on the part of Naylon to draw any necessary checks, papers, or vouchers to obtain possession of the money. This assignment was dated the 3d day of March, 1908, and was acknowledged before the notary on the same day. It was necessary to have Callahan raised up by the nurse and held in order to get his signature to the papers. The Naylons remained in Washington until after Callahan's death, and brought his body with them to Rochester for burial. Notice of Callahan's death was given in the Rochester papers on March 31, 1908. Michael Naylon took the check which was signed by Callahan to the Rochester Savings Bank, opened an account there, and deposited the check. The check went through the clearing house in the ordinary way, and was paid by defendant bank on March 16, 1908. The defendant offered evidence tending to show that no knowledge of Callahan's death came to it or to any of its officers until some time after the check was paid, and the defendant claims that by its payment of the check in good faith, and without knowledge of Callahan's death, it is relieved from all liability to the plaintiff. As a further defense, the defendant alleges that the assign-

ment above referred to was valid and transferred title to the deposit to Michael Naylon, although it is conceded that the defendant had no notice of the assignment until November, 1909. Upon the trial the signature of Callahan to the check and to the assignment was disputed as was also his competency to execute them.

The court submitted to the jury six specific questions as follows:

'(1) Did John Callahan sign the check?
"(2) Did he know what he was doing?
"(3) Did John Callahan sign the assignment?
"(4) Did he know what he was doing?
"(5) Did he intend to transfer the bank deposit to Michael Naylon?
"(6) Did the bank pay the money without knowledge of the death of John Callahan and in the due course of business?"

The jury answered all six questions in the affirmative. The court charged the jury in part as follows:

"If John Callahan signed the paper (the check), and knew what he was about when he signed it, the verdict goes to the defendant, unless you can find that the defendant did not pay this money in good faith, without notice or knowledge of his death. If it paid it in the course of business and in good faith, without notice of the death of John Callahan, the verdict goes for the defendant. So, too, if John Callahan, before his death, parted with all his interest in that deposit by means of this assignment, the verdict goes to the defendant, because, if he had no interest in the deposit, the plaintiff, the administrator, could not succeed to any interest. If John Callahan executed an assignment, knowing what he was doing, intending to transfer his interest therein to Michael Naylon, and it was delivered with that intent, the plaintiff has no standing in court, because the interest of John Callahan was assigned to Naylon. It is claimed that he did not know what he was about when he signed the check or the assignment, if he signed either or both. If he did not, the papers were void, and the plaintiff would be entitled to a verdict at your hands."

Plaintiff excepted to that portion of the charge in reference to payment by the bank in good faith without knowledge of Callahan's death, and asked the court to charge that, if the defendant had not accepted the check prior to the death of Callahan, it was not authorized to pay it after his death; also, that the agency and authority to pay on the check, if the jury should find that the check was executed and delivered to Naylon, terminated with Callahan's death. The court declined to charge as requested, and plaintiff excepted. During the trial the Naylons were called as witnesses for the defendant, and testified at considerable length as to the transactions between themselves and the deceased with reference to the execution and delivery of the check and the assignment. The plaintiff objected to the admission of their testimony as to any such transaction upon the ground that they are not competent to so testify under section 829 of the Code of Civil Procedure. Plaintiff's objections were overruled and exceptions were taken to such rulings.

[1] The jury found that the check in question was the check of plaintiff's testator, that it was presented at the bank in the ordinary course of business, and that it was paid in good faith by the defendant, and without any knowledge that plaintiff's testator had died before such payment. It seems to me that, under such circumstances under the Negotiable Instruments Law, the defendant was relieved from

again paying the amount of the check. If this be not so then it is hard to see how the banking business can be conducted with any safety to a banking concern. To illustrate: A man residing in California has an account in a bank in the city of New York upon which he has been accustomed to draw checks directing the payment of the money by such bank to the payees named in such checks. Is it conceivable that under the present banking system the bank upon which such check is drawn must inquire at the time such check is presented whether the drawer is dead? If so, every business transaction in the country must be held up until that fact can be ascertained by the bank upon which such check is drawn.

No case has been called to our attention where this question has been decided by the courts of this state. The text-book writers do not seem to advance very decided views on the subject. Daniels, in his work on Negotiable Instruments, discusses the question somewhat at length saying ([4th Ed.] § 1618B):

"Whether death of drawer revokes check. The death of a drawer of a check, as is stated by many authorities, operates as a revocation of the authority of the bank or banker upon which it is drawn to pay it; and though it is conceded that, if the bank or banker pay the check before notice of the death, the payment is valid; otherwise, it has been considered, it is not. This view has been generally based upon the decision in the English case of Tate v. Hilbert, where it was held that the gift of a common check on a banker payable to bearer was not a valid donatio mortis causa, or an appointment or disposition in the nature of it. It is quite true that authority to an agent is revoked as a general rule by death of the principal; but this doctrine is qualified by the equally well-settled principle that, if the authority be coupled with an interest in the thing vested in the agent, the death of the principal operates no revocation. Now, where a check is given to the payee for a valuable consideration (and the check imports value), the authority to the payee to collect the amount from the bank is coupled with a vested interest in the check. He can sue the drawer upon the check if it be dishonored. The drawing of the check without funds to meet it is a fraud, and the English case above referred to does not determine, as has been supposed, that, when the check is given for value, the authority of the banker to pay it is revoked. The death of the drawer of an ordinary bill of exchange does not revoke it, and we can discern no principle of law which allows the death of the drawer to affect the rights of a check holder who has given value for it. The idea that the death of the drawer of a check given to the payee for value operates a revocation is, as it seems to us, a total misconception of the law; for a check is a negotiable instrument as often, if not more frequently, given for value, than any other species of commercial paper. The drawer is deemed the principal debtor; and it is anomalous to hold that his death in any wise lessens his obligations, or the right of the bank to pay it, when given for value."

In the case at bar, it is conceded that the check in question was given to Michael Naylon without consideration and with the intention upon the part of the drawer, Callahan, that Naylon should present it for payment only in case of Callahan's death. We are, however, of the opinion that it is immaterial whether the check was a gift, or whether it was given for value. It is a long-established rule of the law merchant that a negotiable instrument imports value, and we think that, when a check is presented for payment to the bank upon which it is drawn, the banker is authorized to rely upon the presumption that the check is given for value. He is not called upon to presume that the

check was a donation. There is no reason why he may not rely upon the presumption which protects a purchaser in good faith and for value in due course of business. To hold otherwise would be to declare that one presumption attains in reference to the check while the drawer is alive and another to the same instrument upon his death.

We think the trial court was right, however, in charging the jury that if the bank had had knowledge of Callahan's death before the check was presented for payment, or if it had learned facts sufficient to put a reasonable man upon his inquiry, it was not protected in paying the check, and upon the evidence presented upon this question the jury were warranted in finding as they did, that the defendant paid the check in good faith, in due course of business, and without knowledge of Callahan's death.

[2] But, further, we are of the opinion that the assignment above referred to was sufficient to transfer to Michael Naylon all the interest which Callahan had in the deposit in defendant's bank, and clearly Callahan's death could have no effect upon the validity and force of this assignment. The evidence as to the genuineness of Callahan's signature presented a question of fact for the jury, and we think their finding as to the genuineness of his signature was supported by ample proof. It was further claimed that he was not competent to execute the assignment at the time it was executed, and that he did not know what he was doing. The evidence on this point was more conflicting than upon the question of the genuineness of his signature, but we think the finding of the jury on this question is clearly supported by the evidence.

[3] It is urged, however, by the appellant that the court committed reversible error in receiving the evidence of the Naylons as to personal transactions between themselves and the deceased in reference to the execution and delivery of the note and assignment; it being alleged that they were incompetent to testify under section 829 of the Code of Civil Procedure. In our opinion that section does not bar them from testifying to such transactions. They were not parties to the action nor interested in its event. They were undoubtedly interested in the questions involved, but would not be bound or concluded by the judgment of the court in this action. Nor were they persons through whom the defendant derived its interest within the meaning of that section. Hoffman v. Union Dime Savings Institution, 95 App. Div. 329, 88 N. Y. Supp. 686; Connelly v. O'Connor, 117 N. Y. 91, 22 N. E. 753.

It follows that the judgment and order appealed from should be affirmed, with costs.

Judgment and order affirmed, with costs. All concur; SPRING, KRUSE, and ROBSON, JJ., in result only.